## UNITED STATES *v.* BOSTWICK.

1. In this case, no formal lease of the property was executed; but the court holds that the correspondence under which the United States entered into occupancy constituted a contract of letting for one year, with a privilege of three, at a rent of $500 per month, without restriction as to the use to which the property might be put.

2. Unless excluded by the operation of some express covenant or agreement, there results from the relation of landlord and tenant an implied obligation on the part of the latter not to commit waste, nor, by his failure to exercise reasonable care, permit it to be committed.

3. In the absence of an express covenant to repair, a tenant is not answerable for accidental damages, nor is he bound to rebuild, if buildings are accidentally destroyed by fire or otherwise.

4. The destruction of ornamental trees, fences, walls, &c., and the quarrying and removal of stone and gravel, is voluntary waste, within the prohibition of the implied agreement, for which the tenant is answerable.

5. In this case, the property having been rented by the United States "for all purposes," no recovery can be had on account of its use for a small-pox hospital.

6. The obligations of the United States relate to the condition of the premises at the time the term commenced. For damages done before that time by the army engaged in the suppression of the rebellion, no action can be maintained in the Court of Claims.

7. The acceptance, without objection by the lessor, of reduced rates of rent after the expiration of the first year is conclusive evidence of his assent, in consideration of the continued occupancy by the United States, to a modification of the original agreement in that particular.

APPEAL from the Court of Claims.

This was a suit by Thomas R. Lovett, trustee of Mrs. Louisa Fletcher, against the United States, to recover the rent of and for damages to certain real estate and premises situated in the District of Columbia, and known as Kalorama.

The Court of Claims found the following facts : —

Thomas R. Lovett, as trustee of Mrs. Louisa Fletcher, was, on the seventeenth day of August, 1861, seised in fee of said premises, containing about ninety-one acres, a dwelling-house with wings, measuring in all one hundred and fifty by forty feet, a large stable, and a frame building, with a garden, lawns, and walks, a fence all around the premises, and a substantial wall, about a quarter of a mile long, from Rock Creek to the lodge gate on Boundary Street, and trees of various kinds, and shrubbery.

In consequence of application made to him for the lease of the premises to the United States for a hospital, by General Mansfield, Lovett authorized the following writings, marked 1 and 2 : —

"No. 1.

"General, — Inclosed is a note of terms for the mansion and lower grounds of Kalorama.

"The upper grounds contain about seventy acres, which may be occupied by the quartermaster for horses and wagons, or whatever else may be desired, at the rent of $100 per month.

"Respectfully,

"Charles F. Fletcher,<br>"<i>For</i> Thomas R. Lovett, <i>Trustee.</i>

"To General Mansfield, *B. G. &c.*"

"No. 2.

"Kalorama, Aug. 17, 1861.

"General Mansfield:

"Sir, — I offer to the government, for the purposes of a hospital, that part of the place known as Kalorama, comprising the house and porter's lodge, together with about thirty acres of land immediately surrounding and including both sides of Rock Creek, bordering the same, upon the following terms: —

"The lease to be for the term of three years, with the privilege to the government to renew the same for three years longer, at the same rent, $450 per month.

"There will be left in the building a portable furnace and hall-stove, for the use of the government. It will be stipulated that the trees and shrubbery on the grounds shall be strictly protected, and any unnecessary injury to the same to be compensated for by the government; the buildings to be kept in repair by the government, and to be left in as good repair as ordinary wear and tear will permit. The grounds having already been occupied by troops, and the fence thereby destroyed, it is expected that the government will renew them, and leave them in good repair at the expiration of the term.      Very respectfully, yours, &c.,

"Charles F. Fletcher,<br>"<i>For</i> Thomas R. Lovett, <i>Trustee.</i>"

Thereafter General Mansfield issued and sent to Lovett the following: —

"Head-quarters, Department of Washington,<br>"Washington, Aug. 17, 1861.

"As soon as vacated, within two weeks the United States will hire the whole property of Thomas R. Lovett, trustee of Mr. Charles F. Fletcher, &c., above, on the following terms, inclusive

of his upper lot, and all his land and privileges, for $500 per month, for the period of one year, with the privilege of keeping it at least three years, if desirable for all purposes.

" MANSFIELD, *B. G., &c.*"

Under the agreement above made the United States entered upon and occupied the said premises specified in General Mansfield's order, from Aug. 23, 1861, to Sept. 30, 1867, inclusive.

For rent of said premises the United States paid to the said Lovett $500 per month, from Aug. 23, 1861, to June 30, 1862; and for each monthly payment the petitioner signed a receipt, the form of which was as follows: —

" *The United States to Thomas R. Lovett, Trustee, Dr.*

"1862. For rent of Kalorama, occupied as hospital, from
        June 1 to June 30, 1862, at $500 per month   .  $500.00

" I certify that the above account is correct and just, that the services were rendered as stated, and that they were necessary for the public service.     E. E. CAMP, *Captain, A. Q. M.*

"Received at Washington, D. C., the 15th of July, 1862, of Captain E. E. Camp, Assistant Quartermaster United States Army, the sum of five hundred dollars and     cents, in full of the above account.     THOMAS R. LOVETT, *Trustee.*"

For rent of said premises the United States paid to Lovett $250 per month, from July 1, 1862, to Feb. 1, 1865; and for each monthly payment he signed a receipt, in the following form: —

" *The United States to Thomas R. Lovett, Trustee, Dr.*

"1862. For rent of Kalorama, occupied as a hospital
        and camp-grounds, from July 1 to Sept. 30,
        1862, at $250 per month . . . . . . . .  $750.00

" I certify that the above account is correct and just, that the services were rendered as stated, and that they were necessary for the public service.     E. E. CAMP, *Captain, A. Q. M.*

"Received at Washington, D. C., the 9th of October, 1862, of Captain E. E. Camp, Assistant Quartermaster United States Army,

the sum of seven hundred and fifty dollars      cents, in full of the above account.                    THOMAS R. LOVETT, *Trustee*."

From the 1st of February, 1865, to Sept. 30, 1867, inclusive, the United States paid for rent of said premises $200 per month; and for each payment received a receipt, in the form annexed.

" *The United States to Thomas R. Lovett, Trustee, Dr.*

" 1867.

" Sept. 30. For rent of Kalorama, as hospital and camp-
              ground, from Sept. 1, 1867, to Sept. 30,
              1867, one month  .  .  .  .  .  .  .  .  .    $200.00

" I certify that the above account is correct and just, that the services were rendered as stated, and that they were necessary for the public service.                    A. P. BLUNT,
                              " *Brevet-Colonel & A. Q. M., U. S. A.*

" Received at Washington, D. C., the 30th of September, 1867, of Brevet-Colonel A. P. Blunt, Assistant Quartermaster United States Army, the sum of two hundred dollars and      cents, in full of the above account.                    THOMAS R. LOVETT, *Trustee*."

While the United States occupied the premises from Aug. 23, 1861, to Sept. 30, 1867, the main house was burned; the flower-garden and shrubbery were destroyed; three and one-half miles of fence torn down; a brick wall fifty feet long, nine feet high, and fourteen inches thick torn down, and the bricks used, partly for pavement and partly for building a lime-house, where the United States put clothes for purifying them. Some sheds were torn down. The part of the house not burned, about fifty feet long, was greatly damaged, and the glass, with the sashes, was carried away. Ornamental and shade trees of various kinds were cut down; a stone wall was taken down, and most of it carried away; and stone quarried and gravel dug from a quarry and a gravel-pit on the premises, and carried away. The premises were left in a dilapidated condition, and the house unfit for occupancy. To restore the building and premises to their condition when leased, reasonable wear and tear excepted, would have cost $20,000.

The stone quarried and carried away by the United
    States amounted to 2,327 perches, and was worth
    25 cents per perch . . . . . . . . . . .     $581.75
The gravel dug and carried away by the United
    States amounted to 2,347 yards, and was worth
    $21\frac{7}{10}$ cents per yard  . . . . . . . . . . .     509.20
The stone wall taken down and carried away
    amounted to 505 perches, and was worth $3.50
    per perch . . . . . . . . . . . . . . .     1,767.00

The extent and valuation of the damage to the part of the
dwelling-house not burned, or to other buildings, the number
or the value of the trees cut down, the value of the brick wall
or fence destroyed, and the disposition of a fire-proof safe, boiler,
stove, and heater, were not shown.

Two regiments were, previous to said written contract, en-
camped by the United States on the northern part of said
premises; and thereon and during such occupation, previous to
said contract, about fifteen hundred trees were cut down and
a portion of the fencing destroyed by the soldiers of said
regiments.

All the injuries to said premises during the occupation thereof,
or of any part thereof, either previous to or during said written
contract, were done by the military forces of the United States
engaged in suppressing the rebellion, who were encamped on
the premises previous to said written contract, or who occupied
them under said contract.

The dwelling-house was used by the United States for a
small-pox hospital, and the ground as a camping-ground for
soldiers. Seven or eight soldiers who died were buried on the
place; and since it was vacated by the United States, Sept. 30,
1867, it has not been rented.

At the time the dwelling-house was burned it was insured by
the Ætna Insurance Company and the Firemen's Insurance
Company, on two policies of $5,000 each. Those companies
adopted as their highest rate of insurance on buildings three-
fourths of their cash value. The amount of the insurance,
$10,000, was paid to the petitioner for a total loss.

On the 21st of December, 1868, Lovett presented for pay-
ment to the United States the following account or bill: —

*The United States to Thomas R. Lovett, Trustee, Dr.*

1867.

Oct. 1.    To rent of Kalorama, from Aug. 23, 1861, to

A¹. A².        Oct. 1, 1867, 73 months, 8 days, at $500  .  $36,645.16

By cash on account  .  .  .  .  .  .  .  .  .    19,295.16
                                                ─────────
Balance  .  .  .  .  .  .  .  .  .    17,350.00

Vo. 1.    Damage to out-buildings  .  .  .  .  .  .  .    3,300.00

2.    Do.        stable .  .  .  .  .  .  .  .  .        200.00

1 & 2.  ·  Do.        lodge .  .  .  .  .  .  .  .  .        200.00

B. C. D. Value  of  stone  taken  from  the  quarry,
            6,659 pr., at 25 cents  .  .  .  .  .  .  .  .    1,664.75

B. C. D. Value of gravel taken from the pit, 2,347
            yards, at 30 .  .  .  .  .  .  .  .  .  .        704.10

2. 4.    Trees destroyed  .  .  .  .  .  .  .  .  .        800.00

B. D.    Stone wall taken, 505 perches, at $5  .  .  .    2,525.00

2 5 & 4  1,000 panels of fence .  .  .  .  .  .  .  .  .    1,000.00

Fire-proof safe .  .  .  .  .  .  .  .  .    $60

Boiler .  .  .  .  .  .  .  .  .  .  .        30

Stove .  .  .  .  .  .  .  .  .  .  .        33

Heater .  .  .  .  .  .  .  .  .  .  .  ‹    95
                                            ─────
                                                        218.00
                                                    ─────────
                                                    $27,861.85

E. & O. E.

JOHN D. McPHERSON, *Attorney, &c.*

DEC. 9, 1868.

On Feb. 8, 1870, the following notice was sent to Lovett : —

" WAR DEPARTMENT,

" QUARTERMASTER-GENERAL'S OFFICE,

" WASHINGTON, D. C., Feb. 8, 1870.

" THOMAS R. LOVETT, Esq., Washington, D. C. :

" SIR : You are respectfully informed that your claim as trustee,
&c., of the premises known as ' Kalorama,' in this District, has this
day been referred to the third auditor of the treasury for the pay-
ment of $21,040.42.

" Very respectfully, your obedient servant,

" By order Acting Quartermaster-General,

" JAMES A. EKIN,

" *Deputy Quartermaster-General,*

" *Brevet Brigadier-General U. S. A.*

" 120–103 Claims."

The facts following were requested by the petitioner.

In October, 1867, the claimant made out and presented to the Secretary of War the following claim : —

*United States to Thomas R. Lovett, Trustee, Dr.*

1867.

Oct. 1.  To whole amount of rent according to contract, from Aug. 22, 1861, to Oct. 1, 1867, 73 months, 8 days, at $500 per month  . .  $36,645.16

Less amount received, from Aug. 23, 1861, to July 1, 1862, at $500 per month . . . . . . . .  $5,145.16

From July 1, 1862, to Jan. 31, 1865, at $250 per month . . .  7,750.00

From Jan. 31, 1865, to Oct. 1, 1867, at $200 . . . . . . .  6,400.00

|  |  |
|---|---|
|  | 19,295.16 |

Balance . . . . . . . . . . . .  $17,350.00

To estimated cost of rebuilding burnt portion of mansion  . . . . . . . $16,300

Less insurance . . . . . . . . . 10,000

|  |  |
|---|---|
|  | 6,300.00 |

To estimated damage to outbuildings and wing, independently of fire . . . . . . . .  3,300.00

To damage to stable . . . . . . . . . . .  200.00

To damage to lodge . . . . . . . . . . .  100.00

To value of stone taken from quarry (2,327 perches). . . . . . . . . . . . . . .  581.75

To value of gravel taken from pit (2,777 yards) . . . . . . . . . . . . . . .  833.00

To damage to hill in consequence of digging gravel . . . . . . . . . . . . . . .  500.00

To trees destroyed . . . . . . . . . . . .  800.00

To cost for replacing stone wall on Boundary Street (420 perches) . . . . . . . . . .  1,310.00

To 1,000 panels rail-fence . . . . . . . .  1,000.00

To fire-proof safe . . . . . . . . . . .  60.00

To copper boiler . . . . . . . . . . .  30.00

To hall-stove . . . . . . . . . . . . .  33.00

To portable heater . . . . . . . . . . .  95.00

|  |  |
|---|---|
|  | $32,493.25 |

. Which was by the Secretary indorsed as follows : —

(Indorsed :) " 28–1–'70.  $\frac{129}{163}$ Kalorama.  Referred to the Quartermaster-General for investigation and report.

" EDWIN M. STANTON, <i>Secretary of War.</i>

" FEB. 12, 1868."

On this claim the Quartermaster-General reports as follows : —

" QUARTERMASTER-GENERAL'S OFFICE,<br>" WASHINGTON, D. C., Nov. 11, 1869.

" Hon. WILLIAM W. BELKNAP,

" Secretary of War, Washington, D. C. :

" SIR, — I have the honor to return the enclosed claim of Thomas R. Lovett, trustee, &c., for rent and repair of premises known as 'Kalorama,' in this city, and for gravel, stone, &c., stated at $32,493.25, referred to this office from the War Department for further report, in connection with the additional evidence presented, and to invite your attention to the full abstract of the case herein.

" I consider the order of General Mansfield taking possession, and directing a monthly payment of $500, and the fact of the claimant receiving and receipting for this amount, sufficient evidence of a contract or lease, and therefore recommend that rent be paid from Aug. 23, 1861, to Oct. 1, 1867, 73 months, 8 days, at $500 per month, amounting to $36,633.33, subject to the deduction of all sums which were paid the claimant for the use of the premises during United States occupancy.

" It is evident from the abstract that injustice was done the claimant in the previous recommendation of Acting Quartermaster-General Rucker, as to the allowance for gravel taken and used.

" I recommend that Mr. Lovett be paid for 2,777 yards (60,250 bushels) of gravel, at the same rate as that allowed by the War Department in the 'Dennison' case, viz., one (1) cent per bushel, amounting to $602.50.

" So much of General Rucker's recommendation as is for repairs, $2,300, and for 2,327 perches of stone, at 25 cents per perch, amounting to $581.75, I recommend to be adhered to.

" Very respectfully, your obedient servant,

" J. C. McFERRAN,<br>" <i>Deputy Quartermaster-General,</i><br>" <i>Acting Quartermaster-General.</i>

This report being examined by an officer of the War Department, he made a report to the Secretary, concluding with the following recommendation : —

" As to the items mentioned in Mr. Lovett's proposition as being in the house, a fire-proof safe, copper boiler, hall-stove, &c., and for which an aggregate charge of $218 is made, Messrs. Allen and Yeatman say that they are unable to determine whether the responsibility for these rests with the Quartermaster's or Medical Department, and the Quartermaster-General does not ask authority to pay them.  It is considered, however, that, the responsibility of the Medical Department being a matter of doubt, they should be paid for by the same Department as the rest.

" It is recommended, therefore, that the Acting Quartermaster-General be directed to make the payments recommended in his letter of Nov. 11, 1869, and to pay, in addition, the sum of $218 for the items last referred to."

Upon which the Secretary of War indorsed as follows : —

" Approved :

" WILLIAM W. BELKNAP, <i>Secretary of War.</i>"

Whereupon the Quartermaster-General wrote to Lovett as follows : —

" WAR DEPARTMENT,

" QUARTERMASTER-GENERAL'S OFFICE,

" WASHINGTON, D. C., Feb. 8, 1870.

" THOMAS L. LOVETT, Esq., Washington, D. C. :

" SIR, — You are informed that your claim as trustee, &c., of the premises know as 'Kalorama,' in this District, has this day been referred to the Third Auditor of the Treasury for the payment of $21,080.42.

" Very respectfully, your obedient servant,

" By order of the Acting Quartermaster-General,

" JAMES A. EKIN,

" <i>Deputy Quartermaster-General,</i>

" <i>Brevet Brigadier-General, U. S. A.</i>

" Allowed on request of Lovett.        E. G. L."

The accounting officers of the Treasury disapproved of the recommendation of the War Department, and rejected the claim, except as to the sum of $5,159.99, of which action the claimant was duly advised.

The following letter was received by the Quartermaster-General : —

"Washington, Jan. 31, 1868.

" To Brig.-Gen. Rucker, A. Q. M. G., Washington, D. C.:

"General, — In reference to the accompanying account, I would respectfully state that the place known as ' Kalorama,' lately occupied by the government (a plat of which accompanies this communication), comprises about ninety acres of land. It was hired on the seventeenth day of August, 1861, by Brigadier-General Mansfield, on the part of the government, as a hospital and camp-grounds, by written contract, at a monthly rent of $500, of which contract the following is a copy: —

"' Head-quarters, Dep't of Washington,
"' Washington, Aug. 17, 1861.

"' As soon as vacated, within two weeks the United States will hire the whole property of Thomas R. Lovett, trustee of Mr. Charles F. Fletcher, &c., above, on the following terms, inclusive of his upper lot and all the land and privileges, for $500 per month, for the period of one year, with the privilege of keeping it at least three years, if desirable for all purposes.

"' Mansfield, *Brigadier-General, &c.*'

" Possession of the premises was given on the twenty-third day of August, and, on the tenth day of October following, the contract was filed in the office of Captain E. E. Camp, A. Q. M., and by him entered on the roll by order of Brigadier-General Van Vliet.

.    .    .    .    .    .    .    .    .    .    .    .

" I am, respectfully,

"Thomas R. Lovett,
*"Trustee, &c., Mount Airy, Philadelphia, Pa."*

As conclusions of law, the court found, —

That the letter of Charles Fletcher, for Thomas R. Lovett, trustee, dated Aug. 17, 1861, addressed to General Mansfield, as qualified by General Mansfield's reply, dated Aug. 17, 1861, and with that made a contract of lease subsequently acted on by the parties, by the terms of which the United States were bound to repair the premises in case of their damage by fire, and to release them in as good repair as ordinary wear and tear would permit.

That under said contract and under the tenancy between the parties the United States were liable for injuries to the premises, in the nature of waste.

That the claimant is not entitled to damages for the use of the premises as a small-pox hospital by the United States.

That the claimant is barred of all claims for reductions of rent by his receipts in full given for such rents.

That the United States were not entitled to be credited with $10,000 paid to the claimant by insurance companies on policies of assurance obtained and paid for by him for his benefit.

That the report of the officers of the Quartermaster's Department, that $21,040.42 were due to the claimant, approved by the Secretary of War, and ratified by the War Department to the claimant, was not binding and conclusive on the United States.

That the claims of the petitioner for loss by fire and damage by acts of waste were not barred by the Statute of ' Limitations.

There was a judgment of $20,000 in favor of the claimant; from which both parties appealed to this court.

Lovett having died pending the suit, Charlotte Bostwick, his administratrix, was substituted in his stead.

*Mr. Assistant Attorney-General Smith*, for the United States.

The contract under which the United States entered into the occupancy of the premises was completed by the verbal or implied assent of Lovett to the proposition, contained in General Mansfield's letter of Aug. 17, 1861. Lovett's letter of that date was a mere offer, not assented to, and constitutes no contract; for there must be not only a proposal, but an acceptance thereof. 1 Story Contr., sect. 490; *Hazard* v. *N. E. Ins. Co.*, 1 Sumn. 225; *Andrews* v. *Garrett*, 6 C. B N. S. 269; *Tuttle* v. *Love*, 7 Johns. 471.

Where a proposition is made, with certain conditions or limitations, the acceptance must correspond to it in terms; otherwise, it is a new proposition, requiring the subsequent assent of the other party to render it binding. 1 Story, Contr., sect. 503; *Slaymaker* v. *Irwin*, 4 Whart. 369; *Honeyman* v. *Marryatt*, 6 Ho. of L. Cas. 112.

Lovett, in his letter of Jan. 31, 1868, to General Rucker, expressly·declares General Mansfield's letter of Aug. 17, 1861, to be the contract under which the premises were occupied.

General Mansfield's letter was not a lease, but a mere proposition to occupy, which, when accepted, constituted a verbal

letting, and, under the first section of the Statute of Frauds, a tenancy at will.

There was no liability to rebuild in case of fire.  Taylor's Land. & Ten., sects. 101, 146 ; *Leach* v. *Thomas*, 7 Car. & P. 327 ; *Horsefall* v. *Mather*, Holt, 7 ; *Brown* v. *Crump*, 1 Marsh. 567 ; *Rook* v. *Worth*, 1 Ves. Sen. 462 ; *Wainscott* v. *Silvers*, 13 Ind. 497 ; *Warner* v. *Hitchins*, 5 Barb. 666.

The claimant is bound by his assent to the reduction of the rent, especially as the government continued in optional occupancy, upon the faith of his acquiescence.  *United States* v. *Clyde*, 13 Wall. 35.

As the government was not liable to rebuild, it was not liable to make repairs.

General Mansfield's proposition was to take the property " for all purposes," — a term broad enough to include a small-pox hospital, or any other use to which the government might see fit to put it.

*Mr. J. D. McPherson*, for Bostwick.

The court below did not err in taking the whole correspondence to constitute the contract.  Addison, Contr., c. 1, sect. 2, p. 41.

If one enter under an agreement for a lease, and pay rent, the relation of landlord and tenant arises, and the tenant holds under the terms of the agreement, as if embodied in a lease. 1 Platt on Leases, c. 4, sect. 4, pp. 611, 612.

The mere fact that the defendant, modifying certain terms, restates them, does not exclude others not modified or restated.

Out of the relation of landlord and tenant there arises on the part of the tenant an implied contract to use the leased premises in a tenant-like manner.  *White* v. *Nicholson*, 4 Man. & Gr. 95 ; 43 E. C. L. 58 ; *Nave* v. *Berry et al.*, 22 Ala. 382 ; Addison, Contr., sect. 711.

A general covenant to repair is binding on the tenant, whatever may be the cause of dilapidation.  2 Platt on Leases, p. 186 ; *Bullock* v. *Demmet*, 6 T. R. 650 ; *Buckworth Canal Co.* v. *Pritchard*, id. 750 ; *Phillips* v. *Stevens*, 16 Mass. 245 ; 3 Pars. Contr., c. 3, p. 503 ; Taylor's Land. & Ten., sect. 343 ; Addison, Contr., sect. 711.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

In the determination of this cause, it is necessary at the outset to ascertain definitely the terms of the contract under which the United States occupied the property of the petitioner. On the one hand, it is claimed that the proposition of Mr. Lovett was accepted by General Mansfield with modifications, and that all the stipulations suggested by him are included in the contract as finally entered into, unless modified or rejected in terms by the note of General Mansfield. On the other hand, it is contended by the United States that the note of General Mansfield, instead of being an acceptance of the proposition, was a rejection of it, with an offer of new terms, which, when acceded to by Mr. Lovett, embraced all there was of the contract as made. The latter, we think, is the true construction of the correspondence. We know that, when a contract is entered into by correspondence, the whole correspondence must be considered in determining what the parties have agreed to; but we also know that both parties must assent to a proposed agreement before either is bound by it. Here General Mansfield has nowhere indicated a willingness to accept any of the terms offered him, but, rejecting all, has made a new offer of his own. No reference whatever is made by him to any of the special stipulations suggested by Mr. Lovett. All these are laid aside, and he states the terms upon which the United States will hire the property. The words " as above," where they occur in his note, are used to designate the property, not to extend the offer. In short, Mr. Lovett proposed his terms, and General Mansfield his. Mansfield's were accepted, but Lovett's were not.

This being the case, the contract is one by which Mr. Lovett agreed to let, and the United States to hire, the premises described for the term of one year, with the privilege of three, at a rent of $500 a month, and without restriction as to the use to which the property might be put. The United States agree to nothing in express terms, except to pay rent and hold for one year.

But in every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not unneces-

sarily to injure it, or, as it is stated by Mr. Comyn, "to treat the premises demised in such manner that no injury be done to the inheritance, but that the estate may revert to the lessor undeteriorated by the wilful or negligent conduct of the lessee." Com. Land. & Ten. 188. This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates. *Holford* v. *Dunnett,* 7 M. & W. 352. It is not a covenant to repair generally, but to so use the property as to avoid the necessity for repairs, as far as possible. *Horsefall* v. *Mather*, 7 Holt, 9; *Brown* v. *Crump,* 1 Marsh. 569.

There are in this contract no stipulations to take the place of or in any manner restrict this implied obligation on the part of the United States growing out of their relation to the petitioner as his lessees. They had the free and unrestricted right to use the property for any and all purposes, but were bound to so conduct themselves in such use as not to cause unnecessary injury. Whatever damages would necessarily result from a use for the same purpose by a good tenant must fall upon the lessor. All that the relation of landlord and tenant implies in this particular is, that the tenant, while using the property, will exercise reasonable care to prevent damage to the inheritance. His obligation rests upon the maxim *sic utere tuo ut alienum non lœdas.* If he fails in this, he violates his contract, and must respond accordingly.

The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens under the same circumstances will be implied against them. No lease in form was ever executed in this case; but the contract, followed by the delivery of possession and occupation under it, is equivalent for the purposes of this action to a lease duly executed, containing all the stipulations agreed upon.

Such being the agreement of the parties, it remains only to consider the questions arising under it, as they appear in the record.

1. As to the rent. The United States hired for a year absolutely, at the agreed rent of $500 a month, and occupied during

the whole of that term.  They therefore, by their agreement, were expressly bound to pay rent at that rate for the whole of the year.  This they have paid in full to June 30; but after that, until the end of the year, Aug. 23, 1862, their payments have been only at the rate of $250 a month.  Payment by a debtor of a part of his debt is not a satisfaction of the whole, except it be made and accepted upon some new consideration. It is not found that there was any new consideration in this case.  All that appears is, that an account was made out for the rent from July 1 to Sept. 30, at the new rate, and that this account was receipted by Mr. Lovett after payment. Upon this finding, therefore, in the absence of any thing more, showing that the reduction in the rent of the first year was part of the agreement to continue the lease beyond the year upon new terms, the petitioner will be entitled to judgment for rent at the rate of $250 a month, from June 30 to Aug. 23, 1862, that being the balance remaining after deducting payments made.

After the end of the first year the case is different.  The United States were not bound absolutely to keep the premises for a longer term than one year.  After that, they could make new terms, or leave.  The acceptance by Mr. Lovett of the reduced rates from that time, without objection, is conclusive evidence of his assent to a modification of the original agreement in this particular, in consideration of the continued occupancy by the United States.  Having thus secured the occupancy, he cannot now object to the agreement under which it was obtained.

2. As to the use for a small-pox hospital.  Mr. Lovett originally offered the property to the government "for the purposes of a hospital;" and all the receipts for the rent expressly state that the property was being so occupied.  No objection to such an occupancy was ever made; and, if there were nothing more, the presumption would be that the lessor expected the property was to be used for any and all hospital purposes that the necessities of the government for the time being might require.  But the note of General Mansfield is broad enough to cover such an occupancy, for he expressly states that the hiring is to be "for all purposes."  No recovery can be had upon this specification of claim.

3. As to the destruction of a part of the buildings by fire. There was, as has been seen, no express agreement to repair in the lease. The implied obligation is not to repair generally, but to so use the property as to make repairs unnecessary, as far as possible. It is in effect a covenant against voluntary waste, and nothing more. It has never been so construed as to make a tenant answerable for accidental damages, or to bind him to rebuild, if the buildings are burned down or otherwise destroyed by accident. In this case it has not been found, neither is it claimed in the petition, that these premises were burned through the neglect of the United States. No judgment can, therefore, be rendered against the United States on this account.

4. The destruction of the trees and fences, and the digging and carrying away of gravel and stone. Whatever injury was done to the property during the occupation previous to the agreement for the lease cannot be recovered for in this action. Mr. Lovett's proposition included an undertaking on the part of the United States to make good this loss; but his proposition was not accepted, and the case stands as if it had never been made. The obligations of the United States under the lease, as to the preservation of the property, relate only to the condition of the premises as it was when the term commenced. All damage done before that is clearly " damages . . . by the army and navy . . . engaged in the suppression of the rebellion," and on that account not recoverable in the Court of Claims. 13 Stat. 381. But damage after the lease commenced, and while the United States were actually in possession under it, occupies a different position. That comes within the contract by which the rights of the parties in this action are to be determined. As has been seen, that does not bind the United States to make good any loss which necessarily results from the use of the property, but only such as results from the want of reasonable care in the use. It binds them not to commit waste, or suffer it to be committed. If they fail in this, they fail in the performance of their contract, and are answerable for that in the Court of Claims, which has jurisdiction of " all claims founded upon any contract, express or implied, with the government of the United States, which may be suggested to it by a

petition filed therein." Rev. Stat. § 1059; 10 Stat. 612, § 1.  If there had been in this lease an express agreement to repair, certainly it could not have been successfully claimed that the Court of Claims would not have had jurisdiction to award damages for a failure to rebuild after the fire, even though the fire was caused by the soldiers while in the hospital for treatment.  But the implied obligation as to the manner of the use is as much obligatory upon the United States as it would be if it had been expressed.  If there is a failure to comply with the agreement in this particular, it is a breach of the contract, for which the United States consent to be sued in the Court of Claims.  All depends upon the contract.  Without that, the jurisdiction does not include actions for damages by the army; with it, damages contracted against may be recovered as for a breach of the contract.

It appears in the finding that during the occupancy under the lease ornamental trees were destroyed; fences and walls torn down, and the materials used for sidewalks and the erection of other buildings, or carried away; and that stone was quarried and gravel dug from a stone-quarry and gravel-pit on the premises, and taken away.  This was voluntary waste, and within the prohibition of the implied agreement in the lease. For this the Court of Claims can award compensation in this action.  The amount of this damage has not been found

5. The account, as stated in the quartermaster-general's office. This does not conclude the United States.  It was a mere adjustment of the accounts by one of the bureaus in one of the departments of the government, rejected by the accounting officers of the treasury, and never paid.  Certainly this can have no binding effect upon the United States.

The judgment must be reversed, and the cause remanded, with instructions to render judgment against the United States for the rent of the premises from June 30 to Aug. 23, 1862, at the rate of $250 per month, and for the damages done to the property other than the destruction of the house by fire during the occupation of the United States under their lease, except to the extent that the same necessarily resulted from the use of the premises by the soldiers of the army of the United States for the purposes of a hospital and camp-ground, and it is

*So ordered.*