## SLATE CREEK MINING CO. v. SUNDT.

No. 1393.

Third Division.

Dec. 30, 1932.

348

350

354

364

Frank H. Foster, of Juneau, and L. V. Ray, of Seward, for plaintiff.

Donohoe & Dimond, of Valdez, for defendant.

CLEGG, District Judge.

From the foregoing statement, it will not fail to be observed that the original agreement for lease on the part of plaintiff company with the defendant, Arne Sundt, provided that he should carry on mining operations upon the property in any way he saw fit. While this provision is nowhere incorporated in the ten-year lease from the company to Sundt, it is highly significant, in considering the charges against defendant, and should be borne in mind. If it does nothing else, it either indicates a desire on the part of the plaintiff company to secure the defendant, Sundt, as the man to operate their properties on Slate creek, or an entire disregard on their part of the manner in which said properties should thereafter be mined and operated.

It is the contention of the plaintiff that, notwithstanding the lease now in question contains no express covenant for the proper preservation of the mining claims, there is always an implied covenant on the part of the lessee that

he will use the property leased with care and prudence and neither wantonly nor voluntarily do any injury to the estate granted. In this connection they cite the following cases: Anderson v. Hammon, 19 Or. 446, 24 P. 228, 20 Am.St.Rep. 832; Bix Six Development Co. v. Mitchell (C.C.A.) 138 F. 279, 1 L.R.A.(N.S.) 332; Lowry v. Silver City Gold & Silver Mining Company, 179 U.S. 196, 21 S.Ct. 104, 45 L.Ed. 151; Disher v. Disher et al., 45 Neb. 100, 63 N.W. 368; United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65.

In the latter case, it is stated by Chief Justice Waite as follows: "But in every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to so use the property as not unnecessarily to injure it, or, as it is stated by Mr. Comyn, 'to treat the premises demised in such manner that no injury be done to the inheritance, but that the estate may revert to the lessor undeteriorated by the wilful or negligent conduct of the lessee.' * * * This implied obligation is part of the contract itself, as much so as if incorporated into it by express language. It results from the relation of landlord and tenant between the parties which the contract creates." (94 U.S. 53, 65, 66, 24 L.Ed. 65).

With these doctrines this court is in accord, but the preponderance of the evidence in the case must show in a clear and convincing manner that the alleged acts of defendant have caused destruction to the estate before a court of equity would be justified in resorting to the harsh remedy of forfeiture.

The amended complaint in this case may be summarized into four subdivisions, as follows:

First. It is charged against the defendant that his mining operations are carried on in a careless, negligent, and unminerlike manner, to the damage of the estate, property, and equipment of the plaintiff, particularly because of the

failure of the defendant to keep the ditches, flumes, and pipe lines in repair.

What evidence has been produced which the court can rely upon to sustain this charge? By a reference to the lease in controversy, no duty is imposed upon the defendant, Sundt, the lessee, to keep the ditches, flumes, and pipe lines in repair. So far as the lease is concerned, it is entirely silent on this subject. Ditches, flumes, and permanent pipe lines for the transportation of water for mining purposes are special property rights incident to mining, and such property is considered as real estate. Smith v. O'Hara et al., 43 Cal. 371; Bradley v. Harkness, 26 Cal. 69; Anderson v. Campbell, 4 Alaska, 660.

In 4 Alaska, 660, at page 666 of the opinion of Judge Fuller in the last-mentioned case, it is stated, "Water rights are recognized in this jurisdiction as distinct species of property," and further: "When the waters of a stream have been diverted from its natural course, and carried through a ditch, or by other means, and beneficially used in another place, the appropriator of such waters becomes the owner of property of a separate and specific kind. The water right thus appropriated is not necessarily appendant or appurtenant either to the mining claim upon which the water is used, or the mining claim through which the stream flows, whence the water was diverted, but the right to use the water so appropriated belongs to the owner of the ditch constructed for its conveyance, to the extent so appropriated."

If the lessor intended that the lessee should keep all ditches, flumes, and pipe lines in repair so that all available water might be used for hydraulic mining purposes, such a provision might well have been incorporated in the lease, and the failure of the lessee to maintain and keep said ditches, flumes, and pipe lines in repair should have been declared one of the grounds for forfeiture.

It is attempted by the plaintiff to cover this feature of the case by referring to the language of the lease where

it speaks of leasing to the lessee, Sundt, not only the mining claims, but personal property and equipment, and contending that the word "equipment" includes water rights, ditches, flumes, pipe lines, dams, reservoirs, and penstocks, and appliances connected therewith, but the very context in which the word "equipment" is used in conjunction with the term "personal property" demonstrates that the use of the word "equipment" in the lease refers to specific kinds of personal property, such as tractors, autotrucks, Keystone drill, messhouses, and bunkhouses, safes, sleds, and scales.

Webster's New International Dictionary defines the word "equipment" as follows:

"1. Act of equipping, or state of being equipped, as for a voyage or expedition. * * *

"2. Whatever is used in equipping; necessaries or furnishings, as for an expedition or voyage; the articles comprised in an outfit; equipage; as, laboratory equipments. * * *

"3. Railroads. The cars and locomotives; the rolling stock, as contrasted with the roadbed and stations."

From an inspection of the lease, no obligation is imposed upon the lessee thereby for the upkeep or maintenance of reservoirs, dams, penstocks, ditches, flumes, and pipe lines. It would appear from the actual and continuous conduct of the parties that such use as the lessee, Sundt, was to make of the water, ditches, flumes, and permanent pipe lines was to be, and was, permissive merely on the part of plaintiff company, and only to such an extent as Sundt determined he required in his best judgment.

It may be conceded that he was not given a license wantonly, or willfully to destroy any portion of any property, real or personal, of the plaintiff company, and there is no evidence in this case to justify the conclusion that he has done so. Apparently Sundt, in connection with the water rights, flumes, ditches, and pipe lines, made such reasonable use of them as he, in his best judgment, re-

quired for the interest of the lessor, as well as for himself, and certainly he was not bound to construct sheds or buildings in which to store part of such property even if dismantled.

The weight of the testimony is that the deterioration resulting to pipe and fittings by leaving them in the open would be of no consequence, that they were constructed to withstand the elements, and that, being left on the surface of the ground after being dismantled, added no injury to such property, but was, in fact, a proper safeguard for their protection when not in actual use.

■ It is also testified to by Sundt that, with reference to the Iron gulch pipe line, he dismantled it for the purpose of using it in the working of the claims at the mouth of Slate creek, but that he had been delayed in transporting it there, and that such portions of the flume which he removed from the Upper Slate creek ditch at a point near Miller gulch he had used in his operations on the Tenas Fraction or Hot Dog and other claims.

■ Second. It is charged against the defendant that he deposited tailings and débris upon the unworked and valuable portions of certain mining claims, including the St. Louis and Tacoma claims.

It appears from the testimony that, after the execution of the ten-year lease, the defendant, Sundt, having first acquired the right to mine the Kraemer ground, otherwise known as the Snow Placer claim, from its then owners and not from plaintiff, agreed to pay to plaintiff company the same royalty as paid to the plaintiff company from their own properties, and it is clear from the testimony of the defendant, Sundt, that the consideration therefor, in part, was the right accorded to him by a representative of the plaintiff company to deposit tailings from working said claim upon the claims lower down at the mouth of Miller gulch, to wit, the St. Louis and the Tacoma claims.

It may well be assumed that the payment of 20 per cent. to the plaintiff company from operations conducted

on ground which they did not own at all and had no inter-
est in was a prime consideration, in their judgment, for
the privilege of so doing.

It is undisputed in the evidence that each of said last-
mentioned claims, notwithstanding the extensive mining op-
erations conducted on this portion of the creek, still con-
tained small sections which had not been mined and no
doubt carried some values. Just what those values were
the evidence does not sufficiently disclose, as no witness
but the witness J. M. Elmer claims to know the values con-
tained in the unworked portions of these claims. How-
ever, from the fact that any portion of these particular
claims, the St. Louis and the Tacoma, still contained any
bit of ground that had not previously been mined and work-
ed for the gold they contained during a total period of
twenty-seven years of intensive placer mining on that por-
tion of this creek, it is convincing that such unworked
ground contained no mineral values that could be worked at
a profit theretofore.

The testimony of Elmer and his associates who helped
him in making a test of three buckets of dirt extracted
from three different places in the bottom of a small cut
made by the waters of Miller gulch through the tailings
deposited on the upper end of the St. Louis claim does
not convince the court that the values he or they obtain-
ed from rocking and panning the dirt so secured indicates
in any degree the extent of the value of the mineral con-
tent of the upper portion of the St. Louis claim. The gold
secured by these efforts may have been deposited by the
washouts coming down from Miller gulch or may have been
the residue left from the sluicing of a portion of the tail-
ing pile by the Miller gulch waters or it may be that such
samples could not be found anywhere else except in the
bed of the little cut that these witnesses described, especial-
ly three or four or ten feet on either side of either of the
places where such samples were taken. The only sure meth-
od to determine the actual mineral content of the unwork-
ed portions of either the St. Louis or Tacoma claims would

be to clear off the tailings deposited on them from the Kraemer workings and put the original dirt through the sluice boxes or test it by panning throughout its entire surface on bed rock. In the absence of any such test, the court will not find that any values remained which could be worked at a profit in any portion of the St. Louis or Tacoma claims.

It seems almost needless to discuss this feature of the charges against the defendant, Sundt, in view of the fact that it is claimed by the amended complaint and by the evidence that this so-called destructive conduct of his occurred in the year 1928, the first year of the ten-year lease, and, if such conduct of his was actually detrimental to the plaintiff company, it is too late now, after four years of silent acquiescence, to bring this matter up. "Equity aids the vigilant and not those who sleep on their rights."

Third. It is further charged against the defendant, Sundt, that he willfully, knowingly, and intentionally piped tailings and débris resulting from the mining of the Tenas Fraction, Hot Dog, and Hard Luck Bench claims into the valley and channel of Slate creek in an amount in excess of 100,000 cubic yards, filling the channel of said Slate creek and destroying its use for the purpose of carrying tailings and débris resulting from mining operations beyond the property of plaintiff, and that he permitted such tailings to be deposited upon the Hot Dog and Vulcan claims.

From the testimony, it appears, as heretofore stated, that Slate creek valley pinches down to a slight width going downstream below the Humdinger claim, and especially at the point where the Hot Dog and Vulcan claims lie. Naturally, the disposition of tailings from any work conducted above these claims presents a difficult problem for any miner. There is no reliable testimony in this case which convinces the court that the lessee, defendant Sundt, did not use every reasonable care in preventing the bed of Slate creek being filled up by the depositing of an excess

amount of tailings therein. It is clear from the testimony of the defendant and his witnesses that he (Sundt) endeavored at all times to déposit his tailings in a cut previously worked, or in one worked theretofore by other miners, and that he used reasonable care in stacking his tailings in working on all of these claims below the Humdinger so as to prevent an excess amount thereof from blocking the natural flow of Slate creek. His coworkers corroborate his testimony in this regard, and state that the tailings were, in some instances, as much as ten feet from the water line of the stream on either side.

It may be true that at times the natural eating away of the piles of tailings by the running water of Slate creek causes the great piles of tailings ten to thirty feet high to slough off and fall into the bed of the stream, but any one who knows anything of the turbulent character of most mountain mining creeks realizes that, when and where such sloughing occurs, the first high water will sluice out its own course whatever the obstacles. Especially is this true where the side walls of the stream are well confined and the flood waters have slight chance of spreading out and dissipating over a great area.

It is also true that whatever obstructions may rest in the fall season of the year on a mining creek, such as Slate creek, in the bed of the stream, will be entirely carried off, removed, and obliterated by the break-up of the following spring.

The values or supposed values contained in these claims where it is claimed an excess amount of tailings have been deposited are testified to by no other witness except the witness J. M. Elmer, and, as before suggested, his knowledge of such values is either limited by a perfunctory method of examination or tinged with self-interest. The supposed value of the alleged valuable and unworked portion of these claims is largely conjectural, and no witness is more fallible when testifying as to values of mining property than an overoptimistic mining engineer.

The defendant Sundt does not claim to have found any such values in any portion of these claims worked by him. This court does not find from the testimony that the defendant, Sundt, willfully, carelessly, or negligently permitted the irreparable injury of either of these mining claims by depositing an excessive amount of tailings or débris on either of them.

Fourth. It is further charged that the defendant, Sundt, permitted a quantity of hydraulic pipe and a hoist to be destroyed by a snow slide.

It appears from the testimony that the defendant, Sundt, has repaired the hoist and has used it in his operations since its repair, and that the hydraulic pipe mentioned, notwithstanding this accident, was capable of further use. Snow slides are of frequent occurrence in this region, and no person can tell with exactness where a snow slide will occur on any part of a creek like Slate creek.

This subdivision also includes the tractors, the Hall safe and the platform scales which the defendant, Sundt, admits are still in his possession and in a state of actual good repair. The Keystone drill, it is admitted, had its upper structure blown off in a terrific windstorm in February, 1931, and its location during the summer of 1932 in the same place as it was left by the plaintiff company when the company ceased operating these properties personally indicates that its location was considered safe and secure by the plaintiff itself. Such injuries as it may have received, if at all substantial, afford no ground of forfeiture of the rights of the defendant under his lease, as any resulting damage, if one is attributable to his negligence, may be recovered by friendly negotiation or by an action at law.

In conclusion, the court finds from the testimony of the defendant and from his appearance and demeanor upon the witness stand that he appears to be a trustworthy man, somewhat dull in perception and limited in speech, but carrying all the earmarks of honesty and integrity as well as the indomitable spirit born of hard and unrelenting toil.

From a preponderance of the evidence the court finds all the issues in favor of the defendant, and refuses the issuance of an injunction as an alternative to the forfeiture of the lease, being convinced that the grounds therefor are wanting and in fact prohibited by equity and good conscience.

Findings of fact and conclusions of law and decree in accordance herewith may be submitted.