## NORTHWESTERN ENGINEERING CO. v. UNITED STATES.

### No. 13153.

Circuit Court of Appeals, Eighth Circuit.

April 11, 1946.

O. R. McGuire, of Washington, D. C., and Roy E. Willy, of Sioux Falls, S. D., for appellant.

Leo P. Flynn, Asst. U. S. Atty., of Sioux Falls, S. D. (George Philip, U. S. Atty., of Sioux Falls, S. D., and Matthew A. Brown, Asst. U. S. Atty., of Chamberlain, S. D., on the brief), for appellee.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The Northwestern Engineering Company, a corporation, brought this action against the United States of America under the Tucker Act, 28 U.S.C.A. § 41(20), for damages arising from an alleged breach of contract by defendant, and for costs of suit and interest from date of judgment. 28 U.S.C.A. §§ 258, 284. Judgment was entered for defendant and plaintiff appeals.

In 1941 defendant was engaged in improving an airbase owned by the City of Billings, Montana. The work was a Works Progress Administration project sponsored by the City. In connection with the project, defendant advertised for bids for use of a travelling road building machine and operating crew, to be paid for on a production basis. The instructions for bidders contained a description of the work to be performed, and a warning that each bidder should inspect the site, investigate the character of materials and examine the specifications. The specifications required the machine furnished to have a capacity sufficient to place at least 150 tons of material per hour, described the method to be employed in mixing and spreading and provided for payment based on square yards in place as measured by defendant. They further provided that defendant would furnish aggregate, placed in windrows, and necessary bituminous paving materials delivered alongside the paving machine, and would furnish rolling and compacting operations and aggregate for a surface course laid down on the base course in properly sized and spaced windrows. The specifications also provided that the successful bidder should not remove the equipment furnished from the project prior to its release unless authorized to do so by the Works Progress Administration state procurement officer.

The plaintiff, being the successful bidder, obtained a machine having a capacity of 180 tons per hour for which plaintiff was

required to pay the owner $3,000 per month rental, which was stipulated by the parties to be a reasonable rate. The machine and its crew were at the airport ready for work on July 9, 1941. The plaintiff contends that if sufficient aggregate had been furnished by the Government to enable plaintiff to keep its machine operating at substantial capacity for two 8-hour shifts each day, the work could have been completed and the machine released on or about July 31, 1941, which plaintiff contends was the contract date for completion of the work. However, the aggregate was not furnished in quantities sufficient to finish the job by that date, the work continued throughout the summer, and the machine furnished by plaintiff was not released until October 17, 1941.

The plaintiff was paid in full on a production basis for the actual work performed in connection with the contract, and this action is for damages resulting from the delay in completion of the contract during the period from August 1, 1941, to October 17, 1941, during which time the machine and its crew were kept on the job allegedly beyond the contract period.

█ █ The original "Invitation, Bid and Acceptance" signed by representatives of the parties contained no specific reference to a date for completion of the work to be performed nor a date for expiration of the contract. However, copies of the invitation, bid and acceptance furnished by defendant to plaintiff and to defendant's job superintendent, contained a typewritten notation that the contract was to expire not later than July 31, 1941. The plaintiff contends that the typewritten notation constituted a contractual obligation of the parties and that failure of defendant to furnish aggregate sufficient to complete the job by July 31 constituted a breach of contract for which defendant must respond in damages. The copies containing the notation were not executed by the parties and cannot be considered as duplicate originals. Under elementary principles, the instrument signed by representatives of the parties sought to be bound constituted the contract and rights and obligations of the parties must be determined from an examination of that instrument, without regard to the unexplained notation appearing on the unsigned copies. We sustain the holding of the trial court that the contract did not by its terms require the work to be performed at any particular time and that plaintiff's contention that defendant had the absolute duty to supply aggregate in sufficient quantities to assure completion of the work by July 31, 1941, is without merit.

█ The contract provided that the equipment furnished by plaintiff was "to be operated at times and places designated by the government's instructions," and provided for compensation based solely on production. The District Court held, and we think correctly, that under this contract plaintiff could not recover for loss sustained as a result of delay in absence of arbitrary or inexcusable failure or neglect on the part of defendant. The defendant in agreeing to furnish the aggregate and in requiring a machine having the capacity to mix and spread a minimum of 150 tons per hour, was under the implied obligation to proceed with the work with reasonable diligence. United States v. Smith, 94 U.S. 214, 24 L.Ed. 115; United States v. Mueller, 113 U.S. 153, 5 S.Ct. 380, 28 L.Ed. 946. As stated in the Smith case, supra [94 U. S. 217], "There was no time specified within which the work must be done, neither was there any power reserved in the United States to direct its suspension. Under such circumstances, the law implies that the work should be done within a reasonable time, and that the United States would not unnecessarily interfere to prevent this." In the present case there was an implied condition that defendant would not delay plaintiff in the performance of the work. Kuney v. United States, 95 Ct. Cl. 512. Defendant could not, without reasonable excuse, fail to furnish material to keep plaintiff's machine in operation, but time was not declared to be of the essence and the defendant's duty to furnish sufficient material was not an absolute one. The court has no power to make a new and different contract for the parties. United States v. Cunningham, 75 U.S.App.D.C. 95, 125 F.2d 28.

The cause of the delays encountered in completion of the contract becomes of vital importance. The defendant contends that the delays resulted from inclement weather and other conditions over which it had no control. The plaintiff contends that the delays, at least those occurring in July and August, 1941, resulted from defendant's use of inexperienced labor and supervision in connection with the preparation of the

aggregate. The District Court found as a fact that the delays were caused by "the weather, climate and other conditions over which defendant had no control," and against which it did not undertake to insure plaintiff, and concluded that defendant was in no way liable for the loss resulting from the delays and failure to release the machine until October 17, 1941.

■■ In determining the fact question involved we are mindful that the findings of fact of the District Court will not be disturbed unless they are clearly erroneous. Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c; Smith v. Porter, 8 Cir., 143 F.2d 292; Sandlin v. Johnson, 8 Cir., 152 F.2d 8. A careful study of the record convinces that there is sufficient evidence to sustain the District Court's finding.

The project out of which this litigation arose was one of improvement of an existing airport, not construction of a new one. It was therefore necessary to keep the airport in operation while the work was done and of necessity some delays occurred as a result. When the work was started the airport manager issued instructions that certain portions of the runways must be kept open for traffic, and definite spots were allotted for work so that it would not interfere with airline operations, and this shortened the strip on which the mixing and spreading machine could operate. The plaintiff's evidence that defendant furnished an insufficient number of patrols and other equipment used in conditioning the soil and preparing the aggregate, during the earlier part of the work, is satisfactorily answered by defendant's evidence that additional machinery and equipment would have been useless because of the small area in which the work could be done. At the time the bid was made the plaintiff had knowledge of the conditions under which the work would have to be performed and must be deemed to have entered into the contract with notice of the possibility of delay as a result of those conditions. Cf. H. E. Crook Co., Inc., v. United States, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438.

Much emphasis is placed by plaintiff on the fact that so-called "inexperienced" W. P.A. labor and supervision was used by defendant on the project and that the W.P.A.

did not work on Sundays. Assuming that W.P.A. labor was not as efficient as that employed in private industry at the time, and that Sunday work was the practice in private industry, the plaintiff is again confronted with its own act of bidding on a job in connection with a city-sponsored W.P.A. project. The plaintiff could reasonably expect the use of some W.P.A. labor on a Works Progress Administration project. However, the record deals in generalities so far as it tends to disparage the W.P.A. The evidence in this regard consists, in the main, of the conclusion of plaintiff's witnesses that the work could have been completed in July, 1941, if a private concern had prepared and furnished the aggregate to supply plaintiff's machine.

Another factor that may account for some delay was the presence at the site of other contractors whose presence could of course be expected by the plaintiff.

We are persuaded that much of the delay of which plaintiff complains resulted from the weather conditions at the airport. While there was no record before the court of the rainfall on the field where the work was performed, exhibit IV, showing the meteorological records of the station at Billings, Montana, which is two miles south and 500 feet below the airport, for the months of July, August, September and October, 1941, and a statement of mean temperatures and total precipitation for these months for the years 1894 to 1941, was introduced under written stipulation of the parties. These records disclose a total precipitation for July, 1941, of 1.17 inches at Billings, including .08 on the 11th, .17 on the 12th, .07 on the 19th, .40 on the 20th, .10 on the 22nd, a trace on the 23rd, .16 on the 24th, .11 on the 25th, a trace on the 26th and 28th, and .08 on the.31st. Precipitation for August, 1941, totalled 1.10 inches, including .32 on the 1st, a trace on the 5th, .01 on the 9th, .29 on the 12th, .03 on the 13th, a trace on the 16th, .01 on the 20th, a trace on the 23d, 24th and 25th, .04 on the 26th, .03 on the 27th, .05 on the 28th, and .03 on the 29th and .29 on the 30th. Total precipitation for September, 1941, was 4.99 inches, including rain or a trace of rain on 20 out of 30 days in the month. A total of 1.16 inches of moisture fell in October up to the 17th, including .02 on.the 1st, a trace on the 3rd, .87 on the 4th, .27 on the 5th, and traces on the 8th, 12th and 13th.

The total recorded rainfall during July and August does not, on a cursory examination, appear to have been sufficient to interfere extensively with work at the project. But there are factors other than total amount of precipitation to be considered. The rainfall was scattered throughout the months and defendant's witnesses, who were on the ground and were familiar with the work, stated that the rain did interfere materially with progress. It appears that the aggregate was required by specifications to contain not more than a fixed amount of moisture and that any greater amount would have lowered the quality of the work. The defendant's job superintendent testified that the soil was always wet because of submoisture, making it necessary to move it around and pulverize it. He stated further that some days were quiet and were poor drying days, and that even a trace of rain would retard the work.

The City Engineer of Billings, under whose general supervision the work was done, testified that the project was delayed a great deal because of excessive or periodical rains. In this connection, the witness also testified that another contractor who had charge of paving one of the runways was delayed on account of moisture all during the summer, and did not finish his work that year.

On cross examination, plaintiff's field superintendent at the airport job admitted that as nearly as he could remember there were more cloudy days than clear days, and that there wasn't very good drying weather following the rains. This witness further stated that there were delays caused by moisture but that the moisture could have been eliminated if there had been enough patrols properly handled. He insisted that there wasn't enough rain during July to hinder the work and stated that July was the best month.

The record leaves little doubt that the delays in September and October were attributable to the weather. There were only 10 days during September that it did not rain, and total rainfall for the month was almost three times as great as it was during the same month in any year subsequent to 1907. The October precipitation, following as it did the extremely wet periods of September, was undoubtedly sufficient to interfere drastically with the work in progress at the airport.

We cannot say that the District Court's finding that the delays encountered resulted from the weather and other conditions over which defendant had no control was clearly erroneous or was not supported by substantial evidence.

■■ We have examined the many cases cited by plaintiff and find none to support its contention that rainfall at the airport afforded no excuse for defendant's failure to furnish material to enable plaintiff's machine to work at substantial capacity. Many of the cases cited, so far as applicable at all, merely support the broad proposition that a contract executed by the Government is controlled by the same laws as a contract executed by an individual and that obligations which would be implied against an individual contracting party will be implied against the Government in the same circumstances. There is, and can be, no dispute about this abstract principle. United States v. Bostwick, 94 U.S. 53, 66, 24 L.Ed. 65; Reading Steel Casting Co. v. United States, 268 U.S. 186, 45 S.Ct. 469, 69 L.Ed. 907. But a Government contract, as well as a private contract, is to be interpreted with a view to ascertaining and giving effect to the intention of the parties. Hollerbach v. United States, 233 U.S. 165, at page 171, 34 S.Ct. 553, 58 L.Ed. 898. As the delays were not attributable to the fault or misconduct of the Government, the plaintiff cannot recover. Thomas L. Durocher v. United States, 1922, 57 Ct.Cl. 521. In the Durocher case, the contractor claimed damages allegedly caused by delays to the contract work proper through alleged unwarranted requirements of the contracting officer in having the contractor do work outside the requirements of the contract. It was contended that the contractor was unable to complete the work within the contract time (December 1, 1916) and was compelled to carry over his plant during the winter months. The court, at pages 528, 529 of 57 Ct.Cl., said:

"It will be seen, according to the plaintiff's own statement in his letter asking for an extension of time [dated September 29, 1916], that the delay caused by the extra work was only one of three causes for delay which he assigned, the others being labor troubles and bad weather.

"However, there were other causes of delay, namely, in getting machinery delivered at the beginning of the work, in securing

798

power from the municipal light plant at the beginning of the work, in getting rafts and other equipment ready at the beginning of the work, inability to get covering stone later on in the work and, especially, in taking from the work without securing the consent of the defendant as required by the contract for approximately three months a derrick which previously had done about one-half of the work of placing stone.

"Further, it does not appear how much of the delay was due to these causes and how much was due to the performance of said extra work. * * *

"The court has found that the delay was not attributable to the fault or misconduct of the defendant. It, therefore, follows that the plaintiff can not recover for damages by reason of such delay."

The defendant introduced evidence that there was on the market a waterproofing compound known as Kotal which could have been mixed with the aggregate and would have made it unnecessary to dry the aggregate and permitted laying the mixture under wet conditions. Apparently plaintiff did not suggest the use of this product at the time the work was done, for defendant's witnesses testified that they had never heard of Kotal until shortly before the trial when they read the deposition of the vice president of the Kotal company. According to the deposition, Kotal first became available for general use in 1939, only two years before the airport project. On cross-examination the deponent stated that, as he was not familiar with the soil at the Billings airport, he could not state whether Kotal could be used successfully on that type of base material. The evidence leaves the impression that Kotal was still in an experimental stage at the time of this project, or at least was not in such general commercial use that defendant was required to use it at Billings, or even that defendant would have been justified in doing so.

The District Court's findings are sustained by substantial evidence, and accepting those findings, as we are required to do, we conclude that the failure of defendant to supply sufficient aggregate to keep plaintiff busy was neither arbitrary nor attributable to fault or negligence on the part of defendant. It follows that plaintiff is not entitled to recover for the loss resulting from the delays encountered.

Judgment affirmed.