### W. R. WINKLER v. APPALACHIAN AMUSEMENT COMPANY.

(Filed 25 November, 1953.)

**1. Landlord and Tenant § 33—**

In the absence of express contractual provision to the contrary, the lessee is liable for willful or negligent damage to the premises, including damages resulting from a fire caused by his negligence.

**2. Same—**

Evidence tending to show that lessee of a theater operated a popcorn machine, with open flame gas burner, in a small room in which the operator kept a quantity of oil used in popping the corn, that contrary to written instructions of the manufacturer not to leave the machine unattended, the attendant, on orders from his superior, left the room to deliver a quantity of popcorn to the front of the theater, and that upon his return fire had broken out, *is held* sufficient to be submitted to the jury upon the question of whether the fire proximately resulted from the lessee's negligence.

**3. Contracts § 7e—**

Contracts for exemption from liability for negligence are not favored by the law, and are strictly construed against exemption from liability.

**4. Landlord and Tenant § 33—**

Provisions in a lease that lessee should return the property in good condition, ordinary wear and tear and damage by fire excepted, and that lessee should make all repairs necessary except in case of destruction or damage by fire, *are held* not to exempt lessee from liability for damage from fire proximately resulting from lessee's actionable negligence.

**5. Insurance § 24e—**

Insurer paying a loss is subrogated to the rights of insured against the third person tort-feasor causing the loss, to the extent of the amount paid, both by the provisions of G.S. 58-176 and under equitable principles.

**6. Landlord and Tenant § 33—**

Provision in a lease that lessor should keep the premises insured to the extent of its full insurable value does not expressly or impliedly exempt lessee from liability for damage by fire proximately caused by lessee's negligence.

**7. Evidence § 37—**

Where a written lease forms the basis of a defense asserted by defendant, it is not collateral, and therefore testimony as to its contents is inadmissible by reason of the best evidence rule.

**8. Appeal and Error § 39e—**

Upon appeal from judgment as of nonsuit, the admission of incompetent secondary evidence will not be held harmless on the ground that the same matter would be established by competent evidence upon a second trial when it is not apparent from the record that the best evidence would be of the same import, or, if it were, that it would establish a defense as a matter of law.

**9. Estoppel § 11b: Compromise and Settlement § 2: Trial § 24a—**

Estoppel and compromise and settlement are affirmative defenses upon which defendant has the burden of proof, and therefore nonsuit upon such defenses is improper unless the evidence establishes them as a matter of law.

**10. Landlord and Tenant § 33: Insurance § 24e—**

Where defendant lessee introduces in evidence provisions. of the lease requiring lessor to maintain insurance on the premises, plaintiff lessor is entitled to introduce evidence that insurer had not paid the full loss, to rebut defendant's evidence and to show that plaintiff is entitled to maintain the action as the real party in interest.

APPEAL by plaintiff from *Patton, Special J.,* June Term 1953. WATAUGA.

Civil action by a landlord against his tenant to recover damages for the burning of a theater building allegedly caused by the negligent operation of a popcorn machine.

These are the pertinent facts of the plaintiff's evidence. On 21 January 1950 W. R. Winkler, the plaintiff, owned a building in Boone, which was leased as a moving picture theater to the Appalachian Amusement Company, the defendant. This lease dated 14 September 1938 was between Arthur Hamby and the plaintiff as lessors, and A. F. Sams, Sr., and A. F. Sams, Jr., as lessees. Prior to 21 January 1950, the plaintiff had become the sole owner of the premises and successor to the original lessors, and the defendant the sole lessee and successor to the original lessees.

At the southwest corner of the building behind the stage and screen was a small room about six or seven feet by about five feet, with the ceiling

about seven feet high. The room had a wood floor and plastered walls and ceiling. In this room the defendant operated a popcorn machine. The popcorn machine was about two or two and one-half feet high, and was on top of a wood table about two feet high and around three feet long. Beside the table was a wood hopper in which to dump the popped corn. The machine was operated by Rulane Gas. It had a circular burner under the pan in which the corn was popped. This pan was about two inches above the gas burner, and had a lid on one side, and the other side was stationary; it was about six or seven inches deep and about fifteen to eighteen inches wide. Heat was applied to the pan by lighting the gas burner. The gas was controlled by a valve. There was no automatic control or cut off in case of over-heating. To make a quantity of popcorn the operator lit the burner; as the pan became warm he would follow instructions as to placing oil, salt and corn in the pan. When the gas was burning, the flame was approximately one and one-half to two inches above the burner. The flame was not enclosed.

The operator would put about half a pint of oil in the pan, two teaspoons of salt, and one or two cups of corn. The oil was some kind of popcorn oil, and poured out like motor oil. The base of the oil was peanut oil. There was no evidence as to how volatile peanut oil is, or the temperature at which it ignites. When popping corn there was brought into this room a gallon can of oil, popcorn and about 50 or 100 cardboard boxes for the popped corn. The floor of the room was kept swept out. There was a little oil on the floor that day. A little oil was soaked into the top of the table. Sometimes the popcorn would fill up, and run over, but there was a place for it to run into.

On the afternoon of 21 January 1950 Bill Jones, a 16 year old boy, was popping corn for the defendant in this room. Previously he had helped Russell Swift to pop the corn, and had been told by Swift or Mr. Beach, the local manager of the defendant, how to pop the corn. He had completed the popping of a quantity of the popcorn, when Mr. Beach came back, and asked him to box him 50 boxes of corn. 25 had been boxed. He took those, and asked Jones to bring 25 more boxes up to the front on Main Street. Just before going to the front of the building with the popcorn, Jones filled up the machine, and left it in operation with the flame burning underneath the popper. A crowd in the auditorium was watching the show.

When Jones returned to the room from the front, he saw "flame around next to the hopper, and down in between the popcorn and the hopper, the woodwork. The flames were down next to the hopper and up to the table. The wood was burning. The popcorn was not burning." The popcorn machine was on fire—flames were coming out from under the popper. Jones threw his coat over the fire to put it out. He was unsuccessful.

He went out, reported the fire, and came back with Mr. Beach and Mr. Agle, district manager for the defendant. The room then "was just one blaze, and was reaching to the ceiling." They used a fire extinguisher without success. About a minute or a minute and a half elapsed from the time Jones first saw the fire, until he returned with Beach and Agle.

There was a cooling machine in the theater placed under the left side of the stage. The air ducts were used for cool air in the summer and hot air in the winter. The fire spread rapidly as a result of the flames coming out of the air duct next to the moving picture screen at the back of the theater, causing the damage complained of. This air duct passed over the small room where Jones was popping corn. The air duct was made of a composition fiber board of some type. In the ceiling were holes "about 6 by 6," that had been there several months. These holes were caused by a leak in the roof. Robert Agle described the fire in these words, "As a result of the fire coming through the air duct, then coming out, breaking out through the drapes, the fire just rode up the side of the wall of the dressing room, and those boards, Nos. 1, 2 and 3 at various places, and the fire seemed to jump up the side of the wall and on to the balcony." The floor of the little room did not burn. It is still there in use.

The plaintiff offered in evidence the instructions of the manufacturer of the popcorn machine for its operation. Therein appear the following words: "Always empty popper promptly when corn stops popping, and never leave machine unattended while in operation."

The plaintiff offered in evidence the written lease, dated 14 September 1938, above referred to. Paragraph 9 of this lease reads as follows: "The lessees agree that they will, at the expiration of this lease, deliver up and return possession of the premises to the lessors in as good order, repair and condition as at present, ordinary wear and tear excepted, and damage by fire or other casualty excepted."

Paragraph 3 of this lease contains the following provisions: "The lessees . . . shall, at their own cost and expense, make any and all repairs that may be necessary inside the portion of the building hereby demised, excepting in case of destruction or damage by fire or other casualty, as set forth in Paragraph Six hereof."

Paragraph 6 of this lease contains the following provisions: "The lessors agree to keep said theater buildings, and the equipment hereby leased, insured to the extent of its full insurable value in some reliable insurance company. In event the premises or property hereby leased shall at any time during the operation and continuance of this lease be damaged or destroyed by fire or other casualty, the lessors shall thereupon and forthwith repair and restore said premises and property to the same condition in which they were before the happening of such fire or other casualty."

There was evidence to show that the reasonable market value of the theater building immediately prior to the fire was $100,000.00, and that immediately after the fire the reasonable market value was $60,000.00 to $65,000.00  The plaintiff spent in repairing the damage done by this fire $34,191.40.  The plaintiff spent additional money at the same time on the building.  None of that was included in the figures $34,191.40.

On cross-examination of the plaintiff this evidence was brought out.  On 3 March 1950 the plaintiff and the defendant canceled the lease of 14 September 1938, and the plaintiff and his wife entered into a new written lease with the defendant.  Then the record shows the following on cross-examination of the plaintiff by defendant's counsel: "Q. I will ask you if you didn't agree to this : 'It is stipulated and agreed that the lessors (that is you) at their own expense shall replace the building suitable for occupancy as a first-class theater.' Did you agree to that? Plaintiff objects—overruled. EXCEPTION. EXCEPTION No. 1. A. Yes, I entered into that agreement, and I did replace the building. Yes, I turned it back over to the Appalachian Amusement Company under this new agreement. Q. And Mr. Sams has paid you everything he promised to pay you in that agreement, hasn't he? Plaintiff objects; overruled; EXCEPTION. EXCEPTION No. 2. A. Yes. The Appalachian Amusement Company does not owe me anything under that agreement.  (Counsel for defendant interrogates witness as to whether under the agreement of March 3, 1950, he received $17,250 in cash money.  The objection by plaintiff was sustained, but in the meantime the witness replied, 'No, I received $15,000 under that agreement, and under another agreement $2,250.00.')  Q. Did you use the money received under the March 3, 1950, agreement in paying for the repairs to the building.  (Objection by plaintiff sustained.  The witness is permitted to whisper his answer to the Court Reporter.  His reply was, 'Yes.')." Later on recross-examination of the plaintiff the record shows the following: "At the same time, I entered into the lease agreement of March 3, 1950; I entered into the lease agreement which you hand me— myself and my wife—with the Appalachian Amusement Co.  Q. Did you receive the $15,000 provided for in this from the Appalachian Amusement Co.? Plaintiff objects; overruled; EXCEPTION. EXCEPTION No. 3.  A. Yes.  Q. Did you receive the $2,250.00? A. Yes.  Plaintiff objects; overruled; EXCEPTION. EXCEPTION No. 4.  Q. Did you use the money in paying for the repairing of the Appalachian Theatre that was burned on January 21, 1950? Plaintiff objects; overruled; EXCEPTION. EXCEPTION No. 5.  A. Yes, I used the money for that.  In making this lease agreement March 3, 1950, that was the same building that had formerly been operated by the Appalachian Amusement Co.  Q. Was the building as repaired, the repairing of the building, suitable for occupancy as a first-class theatre by the Appalachian Amusement Company? Plaintiff ob-

jects; overruled; EXCEPTION. EXCEPTION No. 6. A. Yes. Q. Were the damages to the building the damages that occurred from the fire of January 21, 1950? Plaintiff objects; overruled; EXCEPTION. EXCEPTION No. 7. A. Yes."

The plaintiff offered the following testimony, which was excluded by the court upon objection of the defendant, but was written into the record in the absence of the jury. The plaintiff carried two policies of fire insurance on this building. He collected $8,265.76 from one company and $8,265.75 from the other company—making a total of $16,531.51. This amount was paid by the insurance companies for fire damage to this building.

It was stipulated that the two fire insurance policies offered by the plaintiff and excluded by the court provided as follows: One issued by Traders and Mechanics Insurance Company in the amount of $16,000.00 on the theater building and equipment, and one issued by Implement Dealers Mutual Fire Insurance Company in the same amount on the same property. Each policy contained the following provisions: " 'EIGHTY PER CENT CO-INSURANCE CLAUSE.—It is a part of the consideration of this policy, and the basis upon which the rate of premium is fixed, that the assured shall at all times maintain insurance on each item of property insured by this policy of not less than eighty per cent of the actual cash value thereof, and that, failing so to do, the assured shall be an insurer to the extent of such deficit, and in that event shall bear his, her or their proportion of any loss.' " Both policies were in effect at the time of the fire.

At the close of the plaintiff's evidence the court allowed the defendant's motion for judgment of nonsuit. The plaintiff appeals assigning error.

*Deal, Hutchins & Minor for plaintiff, appellant.*
*Scott, Collier & Nash and Trivette, Holshouser & Mitchell for defendant, appellee.*

PARKER, J. The defendant contends that the court was correct in nonsuiting the plaintiff on these grounds: (1) There was not sufficient evidence of actionable negligence to carry the case to the jury; (2) that the language of paragraphs 3 and 9 of the lease relieved the defendant from liability for damages by fire, no matter if caused by its own negligence; and (3) that the language of paragraph 6 of the lease required the plaintiff to keep the building fully insured in order to protect the defendant, even against its own negligence.

In every lease there is, unless excluded by the operation of some express covenant or agreement, an implied obligation on the part of the lessee to use reasonable diligence to treat the premises demised in such manner that no injury be done to the property, but that the estate may revert to

the lessor undeteriorated by the willful or negligent act of the lessee. The lessee's obligation is based upon the maxim *sic utere tuo ut alienum non laedas*. The lessee is not liable for accidental damage by fire; but he is liable if the buildings are damaged by his negligence. *Moore v. Parker*, 91 N.C. 275; *Hollar v. Telephone Co.*, 155 N.C. 229, 71 S.E. 316; *U. S. v. Bostwick*, 94 U.S. 53, 24 L. Ed. 65; 32 Am. Jur., Landlord and Tenant, 669; 51 C.J.S., Landlord and Tenant, 904.

Considering the instructions of the manufacturer of the popcorn machine to "never leave machine unattended while in operation"; that the popcorn machine was about two or two and one-half feet high and the wood table on which it was placed was about two feet high and the ceiling of the room in which it was in operation was about seven feet high; that this machine had an open gas flame from holes in a circular burner about two inches below a pan which contained oil and corn; that this machine was hot from popping fifty boxes of corn; that the manager of the theater instructed the 16 year old boy in charge to bring 25 boxes of corn to the front of the theater; that this boy left the machine in operation with the flame burning; that there had been a hole in the ceiling for several months which exposed the composition material of the air duct; that when this boy returned from the front of the theater where he had carried the 25 boxes of corn, the machine was on fire and flames were down next to the hopper and up to the table; that "as a result of the fire coming through the air duct then coming out, breaking through the drapes the fire just rode up the side of the wall of the dressing room . . . and the fire seemed to jump up the side of the wall and on to the balcony," we are of the opinion, interpreting this evidence in the light most favorable to the plaintiff, and giving to him the benefit of every inference which the testimony fairly supports, as we are required to do on a motion for nonsuit, there was sufficient evidence of actionable negligence for the jury to consider.

The defendant contends that the language of paragraphs 3 and 9 of the lease relieved the defendant from liability for damages by fire, no matter if caused by its own negligence, and in support of its contention makes these points. That paragraph 9 of the lease of 14 September 1938 stipulates that except in case of fire and other casualty and ordinary wear and tear the building shall be delivered up at the expiration of the lease in as good order as at present; and paragraph 3 of this lease says that the lessee shall make necessary repairs to the inside of the building but excludes damages caused by fire, as set forth in paragraph 6. That these provisions of the lease clearly show that the lessors should restore the building destroyed by fire regardless of the cause of the fire. That the plaintiff in March 1950 agreed to replace the building suitable for occupation as a first-class theater, and received from the defendant the sum

of $17,250.00, and is now estopped to deny that the original lease did not contemplate restoration by the plaintiff in the event of defendant's negligence and is barred from maintaining this action by reason of settlement, accord and satisfaction. That the provision of paragraph 6 that the plaintiff should carry insurance to the full insurable value of said building shows the intention of the parties that the lessors should restore the building damaged by fire, regardless of its cause.

These contentions require us to determine whether the language in the instant lease is clear and explicit that the parties intended that the lessee should be relieved of liability for damage by fire caused by its actionable negligence, if the jury should find the defendant guilty of actionable negligence.

Contracts for exemption from liability for negligence are not favored by the law, and are strictly construed against the party asserting it. The contract will never be so interpreted in the absence of clear and explicit words that such was the intent of the parties. *Hill v. Freight Carriers Corp.*, 235 N.C. 705, 71 S.E. 2d 133, where the authorities are cited.

The first question involved is: Whether the words in the lease in paragraph 9 "the lessees agree that they will, at the expiration of this lease, deliver up and return possession of the premises to the lessors in as good order, repair and condition as at present, ordinary wear and tear excepted, and damage by fire . . . excepted," and the words in paragraph 3 "the lessees . . . shall, at their own cost and expense, make any and all repairs that may be necessary inside the portion of the building hereby demised, excepting in case of destruction or damage by fire," exempt the defendant from liability for damage by fire caused by its actionable negligence, if there was such actionable negligence on its part. Similar words have been used in leases for many years to relieve the lessee from any liability caused by accidental fires, or fires caused by the wrongful act of another. Did these words mean that the lessee was to be exculpated from a fire which was the result of its own negligence? Such a concession would scarcely be looked for in a contract between business men. If the parties intended such a contract, we would expect them to so state in exact terms. It would be natural for the lessee, who had contracted to keep up repairs, to desire to escape liability for purely accidental fires and for the lessor to be willing to grant that relief, but it would not be natural that the lessor would be willing to release the lessee from damage caused by its own active negligence. In our opinion, the words in paragraphs 9 and 3 of the lease do not exempt the defendant from liability for fire damage, if caused by its actionable negligence.

There seems to be sound authority to support our position. In 32 Am. Jur., Landlord and Tenant, p. 669, it is said: "A tenant is, however, liable for injury to his landlord from the destruction by fire of a building

on the demised premises caused proximately by the tenant's negligence, even though the lease contains a provision that at the end of the term he shall yield possession 'subject to loss by fire' "—citing *Brophy v. Fairmont Creamery Co.,* 98 Neb. 307, 152 N.W. 557, L.R.A. 1918 A, 367; *Carstens v. Western Pipe & Steel Co.,* 142 Wash. 259, 252 P. 939. The cases unquestionably support the text. The headnote in *Cerny Pickas & Co. v. C. R. Jahn Co.,* 347 Ill. App. 379, 106 N.E. 2d 828, correctly summarizes the decision in these words: "Lease providing, among other things, that lessee is to return premises in good repair and condition at termination, loss by fire excepted, and that lessee is to keep all improvements in good repair, injury by fire or other causes beyond lessee's control excepted, did not expressly or impliedly exempt lessee from liability for alleged negligence causing fire or for alleged violation of positive duty imposed by fire ordinances." The defendant relies upon *General Mills v. Goldman,* 184 F. 2d 359, which adopted a different view. However, that was a three-man court, and *Sanborn, C. J.,* wrote a vigorous dissenting opinion. The opinion of the majority of the Court seems to have been largely affected by the fact that the lessor had fire insurance. In dealing with this point *Sanborn, C. J.,* said: "If the defendant was negligent, as the jury found it was, it became indebted to the owners of the leased premises, on the day the building was destroyed, to the extent of $142,500, regardless of whether the building was then covered by insurance or not. That the insurer is entitled to recoup its loss out of what the defendant owes the plaintiff for having negligently destroyed the insured building, is, in my opinion, of no legal concern to the defendant. *Evans v. Chicago, Milwaukee & St. Paul Railway Co.,* 133 Minn. 293, 158 N.W. 335, 336." *Kansas City Stock Yards Co. v. A. Reich & Sons* (Missouri), 250 S.W. 692, cited by the defendant has different facts. In that case the contract exempted the tenant from liability, if the premises were destroyed by fire, in consideration for increased rental with which landlord was to purchase insurance.

The second question involved is whether the words in paragraph 6 that the lessor shall keep the building insured to the extent of its full insurable value, exculpates the defendant from liability for fire damage caused proximately by its negligence, if there was such.

Upon paying a loss by fire, the insurer is entitled to subrogation to the rights of insured against the third person tort-feasor causing the loss, to the extent of the amount paid, both by the provisions of G.S. 58-176 and under equitable principles. *Buckner v. Ins. Co.,* 209 N.C. 640, 184 S.E. 520; *Ins. Co. v. R. R.,* 179 N.C. 255, 102 S.E. 417; *Powell v. Water Co.,* 171 N.C. 290, 88 S.E. 426. To use the language of *Sanborn, C. J., supra,* that the insurer is entitled to recoup its loss out of what the defendant

owes the plaintiff for having negligently destroyed the insured building is of no legal concern to the defendant.

In our opinion the language in the instant lease does not expressly or impliedly exempt the defendant from liability for any damage by fire to the demised premises caused proximately by its negligence.

The defendant further contends that under the new lease of 3 March 1950 the plaintiff was paid $17,250.00 by the defendant, and is now estopped to deny that the original lease did not contemplate restoration by the plaintiff in the event of defendant's negligence, and is barred from maintaining this action by reason of settlement, accord and satisfaction.

This contention based upon testimony elicited by the defendant over the plaintiff's objection, and his exceptions thereto, form the basis of his assignment of errors Nos. 1 and 2. This new lease agreement embodies a contract between the plaintiff and the defendant; it forms the basis of a defense of the defendant; it is clearly not collateral, and the best evidence rule applies. It was error to admit it. *Chatham v. Chevrolet Co.,* 215 N.C. 88, 1 S.E. 2d 117; *Chair Company v. Crawford,* 193 N.C. 531, 137 S.E. 577; *Mahoney v. Osborne,* 189 N.C. 445, 127 S.E. 533; *Ledford v. Emerson,* 138 N.C. 502, 51 S.E. 42; Stansbury N. C. Evidence p. 415. The defendant states in its brief that if this Court decides that this evidence is incompetent, it is not reversible error for the facts will be brought out at any future hearing. The answer to that is twofold. First, the entire lease is not before us so that we can determine all its terms. On page 33 of the Record the plaintiff said he received $15,000.00 under this agreement, and under another agreement $2,250.00, so apparently there were two agreements subsequent to the fire. Second, nowhere in this testimony does it appear that by this new lease the plaintiff released the defendant from liability for fire damage caused proximately by its negligence. The defendant has not pleaded estoppel as a defense. Further, estoppel, even if pleaded, settlement, accord and satisfaction are affirmative defenses, and ordinarily a nonsuit will not be allowed in favor of the party on whom rests the burden of proof. The evidence admitted by the court, even if competent, does not establish the truth of these affirmative defenses as a matter of law to bring the case within the one exception to the general rule. *Howard v. Bingham,* 231 N.C. 420, 57 S.E. 2d 401; *MacClure v. Casualty Co.,* 229 N.C. 305, 49 S.E. 2d 742; *Hedgecock v. Ins. Co.,* 212 N.C. 638, 194 S.E. 86.

The next question presented: Did the court err in excluding evidence offered by the plaintiff tending to show that the fire insurance companies had not paid plaintiff's full loss, and, therefore the plaintiff was not divested of his cause of action by subrogation? The answer is Yes.

The plaintiff offered in evidence the lease of 14 September 1938, which contained the following provision "the lessors agree to keep said theater

buildings and equipment hereby leased insured to the extent of its full insurable value in some reliable insurance company." This evidence was competent to rebut any inference or contention to be drawn from the lease, that the plaintiff had been paid in full. If the plaintiff had been paid in full by the insurance companies, the insurance companies by right of subrogation would become entitled to the entire recovery, if any, and would be the real party in interest. *Burgess v. Trevathan,* 236 N.C. 157, 72 S.E. 2d 231, where the cases are cited.

The plaintiff's assignment of error No. 4 that the trial court erred in sustaining the motion for nonsuit is good.

For the reasons stated above the case should be submitted to a jury, and the ruling to the contrary is

Reversed.